1

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

UNITED STATES OF AMERICA          §   CASE NO. H-19-CR-00363
                                  §   (1) AND (3)
VERSUS                            §   HOUSTON, TEXAS
                                  §   THURSDAY,
ALDO ROGOBERTO GUERRA-GUEVARA (1) §   MAY 23, 2019
ALDO FERNANDO SOTO (3)            §   3:16 P.M. TO 3:57 P.M.


DETENTION HEARING
(PARTIAL TRANSCRIPT - TESTIMONY OF MARTEZ BENAS ONLY)

BEFORE THE HONORABLE NANCY K. JOHNSON
UNITED STATES MAGISTRATE JUDGE


APPEARANCES:

FOR PLAINTIFF/DEFENDANT:     SEE NEXT PAGE

COURT RECORDER:              CLAUDIO GUTIERREZ

COURT CLERK:                 SHANNON JONES

INTERPRETER:                 ANA MARIA PAREDES




TRANSCRIPTION SERVICE BY:

JUDICIAL TRANSCRIBERS OF TEXAS, LLC
935 ELDRIDGE ROAD, #144
SUGAR LAND, TEXAS 77478
Tel: 281-277-5325
www.judicialtranscribers.com


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

                              APPEARANCES:


FOR THE GOVERNMENT:              US ATTORNEY'S OFFICE
                                 Edward Gallagher, Esq.
                                 1000 Louisiana
                                 Suite 2300
                                 Houston, Texas   77002
                                 713-567-9000


FOR DEFENDANT ALDO
ROGOBERTO GUERRA-GUEVARA:         BENNETT & BENNETT
                                 Mark Bennett, Esq.
                                 917 Franklin
                                 Suite 400
                                 Houston, Texas   77002
                                 713-224-1747

FOR DEFENDANT
ALDO FERNANDO SOTO:              John Parras, Esq.


ALSO ATTENDING:

                                 PRETRIAL SERVICES
                                 David Hernandez

INDEX

| WITNESS: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| MARTEZ BENAS | | | | |
| By Mr. Gallagher: | 4 | . | 37 | . |
| By Mr. Bennett: | . | 32 | . | . |

| EXHIBITS: | Marked | Offered | Received |
|---|---|---|---|
| (NONE) | | | |

HOUSTON, TEXAS; THURSDAY, MAY 23, 2019; 3:16 P.M.

(PARTIAL TRANSCRIPT - TESTIMONY OF MARTEZ BENAS ONLY)

(Official Interpreter utilized for translation.)

THE COURT:  Mr. Gallagher, let's do it.

MR. GALLAGHER:  Thank you, Your Honor.

(Witness previously sworn.)

DIRECT EXAMINATION OF MARTEZ BENAS

BY MR. GALLAGHER:

Q    Would you state your name for the Record?

A    Martez Benas.

Q    How are you employed, Mr. Benas?

A    Drug Enforcement Administration, DEA.

Q    How long have you been a special agent with the DEA?

THE COURT:  All right.  All right.  You two are talking way too fast and the Interpreter is going to have a heart attack, so slow it down.

THE WITNESS:  All right.

THE COURT:  All right.  Go ahead.

MR. GALLAGHER:  Thank you for the reminder, Your Honor.

BY MR. GALLAGHER:

Q    How long have you been employed with DEA?

A    Since August of 2010.

THE COURT:  You need to speak up but slower.

(Laughter.)

MR. GALLAGHER:  Yes, Your Honor.  I'm getting old.

BY MR. GALLAGHER:

Q     Before that, how were you employed?

A     I was employed with the Federal Bureau of Prisons before DEA.

Q     In what capacity?

A     I was a case manager for the Federal Bureau of Prisons.

Q     Now in your capacity as an agent with the DEA, were you involved in an investigation that resulted in the arrest of Aldo Guerra-Guevara?

A     Yes.

Q     And did you, in fact, participate in the arrest in Mr. Guevara?

A     Yes.

Q     Are you the case agent on an investigation involving Mr. Guevara?

A     Yes.

Q     Did that investigation result in a formal charge and indictment against him for drug trafficking and money laundering?

A     Yes.

Q     How did this investigation begin in Houston?

A     Calexico, California was intercepting data wire, BBM, so a BlackBerry Messenger.  They were intercepting an individual by -- they referred to as "Lic MX."   Lic MX is

located in Monterrey, Mexico.  They were intercepting Lic and they -- on their BBMs they started -- they intercepted one of the BBMs that Aldo Guerra was utilizing.

Q    So you opened your investigation as a result of information provided to you by your colleagues or government agents involved in an investigation targeting a Mexican national in Mexico.

A    Yes.

Q    Where in Mexico?

A    In Monterrey, Mexico.

Q    And was this individual identified as a source of supply?

A    Yes, he was.

Q    And did you later confirm him to be a source of supply for Mr. Guevara?

A    Yes, we did.

Q    And the wiretaps were authorized out of the Southern District of California; is that your understanding?

A    Yes.

Q    And those wiretaps were on a BlackBerry Messenger?

A    Yes.

Q    So we're not talking about voice, these are communications between Lic in Monterrey and others that are typed into a device.

A    Yes.

Q      What is that, is that WhatsApp?

A      No, it's not WhatsApp.  Basically every cell phone you can actually download a BlackBerry Messenger.  And BlackBerry Messenger actually is -- it's a third-party PPR. It's a Protective Precise, a company who actually controls all of the BBMs so any time you download a BBM onto your device, a phone number comes with that.

Q      Did you begin to review the BBM, BlackBerry Messenger, content between Lic and Guerra?

A      Yes.

Q      And when did this specifically begin as far as when the communications that you saw between Guerra and Lic?

A      They started in November.  And then in December, we actually started to go out and surveil the individual that was utilizing that device.

Q      And the device -- you're able to identify the devices that Lic is communicating with through a serial number?

A      Well, what happens is: on a -- yeah, on a BBM, we -- what we do is: we send PPR a subpoena and asked PPR for the phone number that's attached to that device.  And then PPR then sends us the phone number that's attached to that device and so basically we utilize the BlackBerry Messengers -- the BlackBerry Messenger and that device to go up -- to ping that phone and go open a GPS on that phone.

Q      And how are you able to confirm that Mr. Guerra here in

Houston was the individual communicating with Lic?

A    It was based on surveillance and identification.

Q    All right.  So you identified Mr. Guerra.

Were you then able to identify a network in Houston that Mr. Guerra oversaw?

A    Yes.

Q    And describe to the Court this network.

A    So the way it was looking, Lic in Monterrey was sent over phone numbers over the BBM to Guerra.  He'd send the phone numbers and those phone numbers were phone numbers of buyers, the individual that was buying, that was being supplied a substantial amount of dope or cocaine.  And when he sends over -- so we went and opened a ping register on that device and identified those phone numbers being called by Guerra.

So basically when Lic MX sends over the message to Guerra saying, "Hey, this individual's going to get 20, this individual's going to get 30, this individual's going to get 40," he was talking about 40 and 30 and 20 kilos of cocaine.  And then what we did is: we -- the ping register showed Guerra then calling up those individuals to come and pick up those -- the cocaine.

Q    So they were speaking in code.  They weren't saying "cocaine."

A    No.  They were speaking in code, yes.

MARTEZ BENAS - DIRECT BY MR. GALLAGHER                    9

Q    Advise the Court, what were the terms used for the drugs themselves?

A    Calves.  They were going -- they were referring to them as "calves."

Q    C-A-L-V-E-S.

A    C-A-L-V-E-S, yes.

Q    And how about cash, were they referring to the cash and you were able to confirm how they were referring to money.

A    Yeah, the money was like "bundles."  Actually, the money was -- the cocaine was referred to as "calves," and the money was being referred to as "bundles."  So they didn't refer to the money as like regular money, it was like bundles.  And so when the guy -- whenever he was delivering the money, he would deliver money in bulk like bundles and they were counting them as bundles as like one bundle, two bundles, three bundles.  It wasn't like they were counting them as individual, "Hey, deliver 800,000."  It was "Hey, deliver 55 bundles."  And those 55 bundles contained like 10 to 15,000 per bundle.

Q    Now you had to have some seizures that confirmed the figures you're now talking about with the Court, correct?

A    Yes.

Q    So there were seizures that later were identical as far as the numbers matching the code, that is, "calves" for cocaine and "bundles" for cash, correct?

A     Yes.

Q     Now the BBM that you were given information started in November of 2018.

How long did you receive intelligence from that BBM out of the Southern District of California?

A     All the way up until January of 2019.

Q     All the way through January.

A     Through January 2019.

Q     So we have basically a three-month period, November, December and January.

A     Yes.

Q     Now as a result of the information and the surveillances, did you then go up on a wiretap on the Defendant's phone that he was using?

A     Yes, we did.

Q     And that was issued, do you recall by --

A     December 20th is when we signed for that T3.

Q     Judge Andrew Hanen?

A     Yes.

Q     And then you were on that wire.  When did it basically stop giving you any intelligence value?

A     January 8th of 2019, when we got the 50-kilo seizure, that's when it basically stopped.

Q     So the Defendant Guerra stopped using his phone at the time of the seizure of 50 kilos of cocaine on January 8th,

2019.

A    Yes.

Q    Now during the BBM investigation, prior to the wire on his phone, were you able to detect conversation between the Defendant and Lic concerned about surveillance, use of cameras or investigative techniques, were they leery of something?

A    Yeah, there were several times.  Actually there was one particular time back in November where we actually put a pole cam up and we observed Guerra in the area and he saw the pole cam going up and he immediately contacted Lic via BBM and said, "Hey, do you have any issues or problems with your guys?"  And he was referring to the individuals that come over to pick up narcotics because those individuals weren't hired by Guerra but they were hired by Lic.

So he said, "Do you have any problems with your guys because I saw individuals like law enforcement put a box up?"  And right after that, they moved that stash.  It was a stash house.  We identified the stash house.  And they moved that location from that location to the location on Corpus Christi to a new location.

Q    Now when you say, "Corpus Christi," you're not referring to the city of Corpus Christi.

A    No, no.  Actually it's a location off of Freeport and Corpus Christi.  They have a stash house in that area.

Q     So it would be an address in Houston.

A     Yes, an address in Houston, yes.

Q     Okay.  So you were able to conduct surveillance on the Defendant.

You never seized any directly from him, correct?

A     No, we never seized anything from him.

Q     All right.  And why you were following him, were you able to detect properties that he controlled or that he had under his control?

A     Excuse me, explain.  I don't understand the question.

Q     Did you follow him to certain properties?  Like where the pole camera was you described.

A     Yes.  So when they identified -- when Guerra identified the pole camera we were putting up, he actually moved the location to the Corpus Christi location.  And during one particular event, the co-defendant that's not here anymore, Adame, he contacted Adame and told Adame that he was on his way to his location but he referred to it as "Titlemax." That was his code for Adame's house was Titlemax.  Titlemax, the reason why he referred to it as Titlemax because right in front of Adame's -- his house is a Titlemax in front of his house so we learned that that location, Titlemax, was Adame's location.  So we surveilled him over there.  And physically they see him at that location.  And then when he leaves that location, he drives past the Corpus Christi

location and as he's driving past, he looks up and then he sends Lic an -- he calls Adame to tell him Adame that there's no cameras here, everything is clean at that location.

Q    So you're actually observing this while he's communicating what's happening with Lic on the BBM.

A    Yes.

Q    Now you have with you a PowerPoint, right?

A    He was communicating with Adame on the phone, yes.

Q    With Adame.

A    Yes.

Q    Okay.  And you have a PowerPoint in front of you, do you not?

A    Yes, I do.

Q    To assist.  And the same PowerPoint was provided to Defense Counsel.  I now mark it as "Government's Detention Guerra Exhibit 1" for the Court to reference.

Now your first page of that PowerPoint sort of describes the organizational structure which includes the co-defendants; is that correct?

A    Yes.

Q    And the co-defendants underneath Mr. Guerra would be the operators that he was referring to as being -- moving drugs and moving money; is that correct?

A    Yes.

Q    Now let's get toward the actual communications leading to the first seizure.  You mentioned Defendant Adame and a 50-kilogram seizure.

A    Yes.

Q    What communications occurred prior to the seizure that caused you to anticipate?

A    Okay.  So the wire went up in December 20th of 2018. During that time, we were -- during Christmas -- Christmas time so everything was slow.  However, we -- when we identified the location over there on Corpus Christi, we were on surveillance from -- I would say from 8:00 o'clock in the morning to approximately 7:00 o'clock at night and we did that every day until January 8th because we basically -- we weren't getting any information like BBMs talk with Lic because Lic in Mexico, he's the individual that kind of controls everything.  He tells -- he'll tell Guerra if the dope was coming.

And when he tells him the dope was coming, Guerra then tells Adame, "Hey, go to the notary."  "The notary," that means go and sign.  A go sign order means go pick up, drop off to -- he actually -- he has referred to the vehicles as "portfolio."  So let's talk about that for a little bit because portfolio's mean -- those are the status vehicles.

Q    Now you're making assumptions from what you're hearing.

Have you since talked to other defendants or individuals that are charged or uncharged and have confirmed that that is the language and that's what it means?

A    Yes.

Q    All right.  In fact, two of the co-defendants you -- are cooperating with you right now, correct?

A    Yes.

Q    And they've indicated to you that "the notary" and "portfolio" means what you just testified is important.

A    One did, one didn't.

Q    Okay.

A    Yes.

Q    So the one was actually active on the -- in the BBM, correct, in contact with Guerra on the wire?

A    Yeah.  Adame was the one that was on the phone and Adame is the one who actually got the -- we seized 50 kilos of cocaine from him.  He agreed to speak with us and cooperate with us.

Q    Let's go to that seizure.  Tell the Court how it happened.  How did we end of seizing 50 kilograms of cocaine from Adame?

A    So we intercepted a phone call with Guerra and Adame where Guerra tells Adame to go to the notary.  So at that point because we had been out there for so long and kind of put a code together, we knew that the notary was -- he was

going to sign.  So with (indiscernible) surveillance, we followed Adame over to a stash location like a warehouse where I guess a truck had already came and dropped off the dope.

Q   So did we already confirm this particular tractor-trailer arrived at the stash house and then left?

A   Yeah, that tractor-trailer that morning had already crossed from Mexico into the United States.

Q   And that was a separate seizure when the tractor-trailer was stopped, correct?

A   Yes, a separate seizure.

Q   All right.  So we'll get to that in a minute.  Let's talk to Mr. Adame.  He's in a private vehicle, correct?

A   Right.  He's in a private vehicle with a trap in it which is -- which we knew that because based on a wire, we knew they like to use Honda Ridgelines because the Honda Ridgeline had -- they have a void compartment on each side but this was actually a (indiscernible) compartment where you pull down the seat and you strap the cocaine on each side.  And you can get 25 on one side and 25 on the other side.

Q   So when you say "trap," it's a hidden compartment that's manufactured?

A   Yes, a hidden compartment, yes.

Q   After the vehicle was already made, they make this

compartment or how does it work?

A    Yes, they make this compartment.  And these vehicles -- we've identified several Honda Ridgelines that utilized by Guerra so it certainly -- it seems like -- appears that he liked Honda Ridgeline.  So as we are following his Ridgeline to this location, we observe the Ridgeline pull back up into a -- into the warehouse with an air wing.  And so in an air wing, you can totally see the vehicle back up in.

Right when the vehicle -- it wasn't even five minutes later the vehicle comes out, takes off.  We traffic stop the vehicle with HPD.  During the traffic stop right away -- Adame right away cooperated with us and actually told us, "Hey, this is what we got."  But before that, we intercepted a phone call with -- I mean, we intercepted a phone call with Guerra where he tells Adame -- or Adame tells him, "Yeah, I just picked up 50 smooth ones."  So "smooth ones" we knew was meant -- we knew was cocaine.

And then he tells -- he directs Adame, he says, "Give 30 to Tio and give 20 to Mechanico."

Q    So Mechanico and Tio are two other individuals identified on the organization chart, correct?

A    Yes.

Q    Tio actually a co-defendant and Mechanico not fully identified.

A    Yes.

Q    And Mr. Adame -- who did Mr. Adame -- did Mr. Adame identify the Defendant, Guerra, as his boss?

A    Right away, yes.

Q    And he explained then how he was doing this at his direction, the 50 kilograms of cocaine.

A    Yes.

Q    Where was it destined to?

A    It was destined to the Corpus Christi address to an individual that's also a co-defendant who's going to elude and they call him Bushong (phonetic) and that --

Q    It's a co-defendant charged --

A    He's a co-defendant and charged in this case.  It was actually -- he was actually at the stash house waiting to receive the narcotics.

Q    Okay.  Right around the time that you're seizing the cocaine, the tractor-trailer is pulled over somewhere else outside of Houston, correct?

A    Yeah.  I think it Fayette -- I think -- I wasn't on there, but I think it was Fayetteville [sic].  They pulled it over somewhere in Fayetteville County.

Q    Fayette.

A    Fayette County.

Q    Okay.  And what was -- did they get the consent to search or have a search warrant?  How are they able to search the tractor-trailer?

A    It was a consent search.  The other co-defendant in this case, Alejandro Razo, he gave consent to search and it was a bunch of Candy -- Mexican candy stored in there.  And right away when we started pulling things out, he started -- on the side of the road just started crying.

Q    What did you find, contraband or US currency?

A    $687,000 and that money was written on there for Tio.

Q    So apparently the money is bundled in a certain way.

A    Yes.

Q    Had you already seen photographs of that money that the Defendant put on his phone?

A    We didn't see the photographs before on that particular seizure, but we did see the photograph of Soto when Soto on the same -- on January 7th, where Soto brings over bundles of money and he told -- is directed by Guerra by -- who sent over an image of the money and we intercepted that image on the wire.

Q    And he's sending the image to Lic?

A    He's going to send the image to Lic, but he sent it to Guerra.

Q    And it shows the bundles of money which apparently is in one of these slides later on which has names on it.

A    Yes.

Q    Typically whose names are on the money?

A    The buyers, the individual buyers.  And actually

speaking with Soto, he actually cooperated with us also and basically told us that he did not put his name on that money, that that money -- that he did bring the money on the 7th, that the money was put on it and it was separated because it was more than one individual that -- he was being supplied so that money was separated to identify as being his money.

Q    Now looking at the -- I believe, the third or fourth slide has contact.  Who's contacting Aldo Guerra, that is, who is the Defendant communicating with?

A    So the first individual is -- they call him S Stuff (phonetic) or it's Tomasichi.  That's SF.  He is the individual that we identified -- he's arrested right now and he's a co-defendant in this case and he actually is the person who controls the Laredo stash house.

Q    And he's in custody in Laredo.

A    He's in custody in Laredo, yes.

Q    And how many contacts did he have with the Defendant?

A    He had over 4,000 contacts with Guerra.

Q    Between what period?

A    Between November 8th of 2018 and December 26th of 2018.

Q    Moving down to Mr. Gonzalez, I believe -- no, Mr. Soto, where we want to cover the co-defendants.

A    Yes.

Q    So there apparently are a number of contacts between

Soto and Guerra?

A    Yes, seven contacts with Soto and Guerra.

Q    Between the same period.

A    No.  December 21st to January 8th, yes.

Q    And the right-hand side, we have co-defendant Adame.

A    Yes, 126 total between the 21st of November and the 8th of 2019.

Q    And then moving down to --

A    Eluid.

Q    -- Mr. Eluid Rodriguez?

A    Yeah, 41.

Q    And then finally Jose Ramirez.

A    13, yes.

Q    Okay.

A    Which is Tio.  That's Tio.

Q    And of course on the prior, we show the number of contacts that Lic is having with the -- with Guerra and with the Laredo --

A    Yes.  Lic is 18,063 and SF is 19,474 which would try to say he controls -- SF controls the Laredo location and Guerra controls over here in Houston.

Q    Okay.  And then we see a sample of the pertinent contacts on two slides regarding the typical communications that were being intercepted on the BBM, that is, between Lic and Guerra.

A     Yes.

Q     And using the code words, as you say, the first one talks about calves, how many?

A     Yes.

Q     They're talking about figures needing to be delivered.

A     Yes.

Q     And these are a representative sample of the drug related conversations between Lic and Guerra, correct?

A     Yes, this is all drug related.  This is all money and drugs that are being exchanged between Lic and Guerra about the co-defendants and what they were actually bringing.

Q     And then the next one I believe is off of the Guerra wiretap where individuals are speaking with or texting Guerra; is that correct?

A     Yes.

Q     Did Lic and Guerra have a conversation regarding the seizures on January the 8th, 2019, the tractor-trailer with 680-plus thousand and the 50 kilos from Adame?

A     Yes.  Lic was concerned.  Well, Guerra and Lic both were concerned about the seizure and they also were concerned that the seizures were seized separately.  So normally it doesn't happen like that.  Normally we seize everything together, but they were concerned with -- it was one -- if it were two separate -- the investigation, was it federal, was it state, because we seized the dope and

somebody else seized the money.  The state seized the money but it was all of us.

Q    So they were concerned that there may have been a larger investigation and they were aware of the stash houses.  Both came from the same stash house.

A    Yes.  And they actually started talking about that. And at that point in time, Guerra didn't -- he didn't drop his phone right away.  So right after that, he sends a message over to Bulshong because we never seized the money from Soto.  And that money actually was -- that vehicle was actually parked at the location that Adame was residing at, the Titlemax place.  And actually he had to get -- they had to get a locksmith to go over there to get into that vehicle to get that money.

Q    And when you say Bulshong, you're talking about co-defendant Eluid Rodriguez Garcia.

A    Yes.

Q    So obviously they're reacting in their conversations.

     Did they express any fear of apprehension?

A    Yes, Guerra -- they both said they couldn't sleep, they were afraid.  And I think Guerra -- I recall, I think he said something like he was worried about when we were going to come knock down his door and arrest him.  And Lic was also concerned about the same thing.

Q    You have a series of a summary of transactions.

A    Yes.

Q    Okay.  Which seems to give totaling for a certain time period.  Explain to the Court what the time period is on that summary chart.

A    So from November 20th, 2018 to January 8th, 2019, there was a total of 489 kilos of cocaine that exchanged hands with Guerra, Adame and the buyers.  So a total -- Mechanico and Tio.

Q    Now this is gleaned from a BBM between Lic and Guerra and also the Guerra wiretap, correct?

A    Yes.

Q    And you've identified four separate individuals that are basically the runners or the individuals actually taking possession or moving the money and drugs.

A    Yes.

Q    That being Ramirez at the top, Gonzalez, Mechanico and Soto, correct?

A    Yes.

Q    And from these totals, you were able to glean kilograms of cocaine was dealt during that period.

A    Yes.  And 797 bundles of US currency which on the low end is about $7,790,000.

Q    And the kilograms of cocaine, what was the average cost per kilo?

A    That was also per kilo in Houston, which is all low end

MARTEZ BENAS - DIRECT BY MR. GALLAGHER                    25

because cocaine has kind of gone up a little bit, is about 25-five.

Q    So if you take 25,000 times 489, is that where you get $12 million from?

A    Approximately, yes.  A little bit more, yes.

Q    The next slide is the delivery of narcotics proceeds. It's where you describe the conversations on January the 7th that led to the seizure, correct?

A    Yes.

Q    And those are the photographs of the actual bundles of money that Guerra had sent to him?.

A    Yes.  This is from Soto and actually like -- and actually talking to Soto who was cooperating with the Government actually told us what this about that, yeah, he was actually delivering the money.  And what he would do, he would deliver the money and then he would wait for a phone call from Guerra to pick up the dope.  Then he'd pick up the dope and he'd take the dope either to Dallas or to Chicago.

Q    So the dope's moving north, the money is moving south.

A    Yes.

Q    Where was the tractor-trailer going that had the 680-southing thousand?  Do we know from the communications where this driver, Razo, co-defendant was headed?

A    Yes.  He was headed back to Mexico, but he also resides in Laredo which is -- that's where everything actually

started in Laredo, the stash house, everything.  All the dope gets crossed in from Mexico into Laredo, stored in Laredo and then is brought to Houston.

Q    That brings us to the next slide which shows the photographs and the description of the money seizure that occurred in Fayette County.

A    Yes.

Q    Is that the tractor-trailer that appears in the upper left?

A    Yes.

Q    And then we have the bundles of money with apparently different names on them?

A    Yes.  And that represents whoever the money belongs to and they're just separating it out.

Q    And that's the tractor-trailer driver in the left-hand corner of the photo?

A    Yes.

Q    And moving onto the next slide, this is the photograph of the 50 kilograms seized from Adame?

A    Yes.  And that's the vehicle.  That's the Ridgeline that we seized it out of.

Q    Was there a conversation regarding the specific figure of 111 prior to this seizure?

A    Yes, there was.

Q    Explain to the Court how the 111 relates to the 50.

A    Okay.  So what they do, they -- like I said, they don't go -- when they count money, they count money by bundles. And so bundles meaning like 55 bundles, 56 bundles and 112 bundles.  So there's an intercepted call where Tio drops off 112 bundles of money and that was for -- that was somewhere around January 3rd.  I can't -- I don't know if it was the 3rd or the 7th but it was somewhere between January 3rd and the 7th where he drops off 112.  And then Guerra tells Lic, he said, "I have 111 bundles," so -- because he opened up one.  So when we actually seized our money, they --

Q    The 56 bundles referenced in the prior slide --

A    Yes.

Q    -- that's the 687,000?

A    Yes.  So that -- and the way they do it is: they -- it was a conversation where Lic talks to Guerra about 55 actually had already made it to Mexico.  And then tells Adame -- Guerra tells Adame, "Take the other half of Tio's" which is 56, "take the 56 over to the notary."

Q    So 56 plus 55 equals 111.

A    111, yes.

Q    So the conversations -- you were able to actually distinguish the amounts totaling 111 from the conversations and the seizure.

A    Yes.

Q    That brings us to the last slide.  This is our Laredo

operator.

What does this tell?  What is -- there's a separate seizure that occurs in Laredo?

A    A separate seizure but we believe it was related.  So the separate seizure occurred in Laredo where Laredo is identified -- Tomasichi, on February 21st.  They did surveil him to a warehouse.  They observed Tomasichi and another individual driving a truck loaded with black pallets.  They then see the vehicle go inside the warehouse.  They then get consent to the warehouse and they seized 33 -- approximately 33 keys of cocaine.

Q    And the pictures at the bottom show the hidden compartments in the pallets themselves?

A    Yes.

Q    And the cocaine in the yellow wrappers that came out of it.

A    Yes.

Q    And did you also have Tomasichi intercepted prior to the January 8th seizure?

A    Yes.  He was intercepted, yes.

Q    And was he intercepted talking about the amounts that were -- that you just referred to, the 111?

A    Yeah.  He had said that he had already received -- he was talking to Lic where he had already received 55, that neighbor -- and he did code -- that number had already put

55 in the corral.  And then basically the 55 we believe was the 55 kilos of the money or 55 bundles of money.  And then the 56 of what we seized.

Q    Was there discussions of trying to get -- trying to find out information through Adame?

A    Yeah.  And that concerned us because when we actually got on -- doing the phone, they didn't realize that the BBMs were still being intercepted and so they were very concerned about getting to Adame.  And so as an agency, we were concerned about that because they really wanted to get to Adame to talk to him.  And they wanted -- and so Guerra tells -- was talking to Bulshong, "Hey, we need to find this guy and go talk to him real good" and all this other stuff.  So we kind of felt like, hey, we wanted to get Adame off -- out of court, off the street because they were actually saying, "Hey, find out if it's federal or state.  We need to find out what happened in this case, what --

Q    They specifically wanted to know whether it was a state investigation or a federal investigation.

A    Yes.

Q    And Adame's case was dismissed, correct?

A    Yeah, we dismissed it because of that reason.

Q    Okay.  And thereafter they wanted to try to have someone learn more about it?

A    Yeah.  They hired -- well, they actually paid a huge

amount of retainer for him.  Well, they say, "Hey, we've got to get a doctor," and they paid a huge retainer to go and have this attorney actually go and get the information.  And then they had another individual that they actually had go talk to the attorney and bring information back to Guerra.  And then Lic tells Guerra, "Hey, when you find out everything, get this information to me right away."  And all of this was intercepted with BBM.

Q    What does Mr. Guerra other than being a drug trafficker do for a living?

A    He has a -- I want to say he has a truck, a dump truck company but he -- in the whole -- the month that we actually was intercepting him we really never heard anything about him working or doing anything with dump trucks or anything.

Q    But you did find evidence of a legitimate business called "Guerra Trucking," correct?

A    We did.

Q    Did you ever find direct evidence that the trucking company was used as a front for drug trafficking?

A    We didn't.

Q    Did you find the Defendant to have other properties in the Houston area that caused you some concern?

A    Yeah.  I was looking -- actually I was looking on the Presentence Report and I was concerned with the fact --

Q    I'm asking you specifically, do you know of certain

properties that the Defendant had that were not identified and I gave you a list of separately?

A    Yes.

Q    And what was that property?

A    There was a property out on -- in Waller County that we actually surveilled Mr. Guerra to.  It's 27774 Muckelroy, or something like that, Road in Hempstead, Texas.

Q    All right.  And what is it valued at?

A    That one's valued over a million dollars.

Q    And what record do you specifically have of the Defendant claiming ownership to that ranch?

A    Well, we actually was in his home where we got consent to search that.  We actually located -- there was a liquor license in that house where it actually had -- where he signed the location saying that he had a liquor license at that location.  He actually signed as the owner of that location and a liquor license actually goes all the way up until August 4th of 2019 so it was current.

Q    And how many vehicles did your record show him owning?

A    My records show him owning seven vehicles and one horse trailer?

Q    And does he own everything outright?  I mean, what kind of liens are on these properties?

A    Everything is paid outright except I think two vehicles, but everything else -- high end vehicles, Range

Rovers and all that and I think all of them -- a lot of them are paid outright.

MR. GALLAGHER:  May I have a moment, Your Honor?

THE COURT:  Yes.

BY MR. GALLAGHER:

Q    Is the Defendant you identified as Guerra and the individual you arrested in the courtroom today?

A    Yes, he is.

Q    Would you identify him by pointing out where he's seated and an article of his clothing?

A    Yeah.  He's got the green jumpsuit at the defense table.

MR. GALLAGHER:  Let the Record reflect that the witness has identified the Defendant.

THE COURT:  It will.

MR. GALLAGHER:  Pass the witness.

THE COURT:  Mr. Bennett?

CROSS-EXAMINATION OF MARTEZ BENAS

BY MR. BENNETT:

Q    Would you spell your name please?

A    M-A-R-T-E-Z.

Q    And your last name?

A    Benas.  B, as in boy, E-N-A-S.

Q    Okay.  Where you up on Mr. Guerra's personal phone or did he -- the phone you were up on, did you hear personal

phone calls on it or was it just --

A    Just dope related.

Q    Dope related.  Okay.  So he had another phone.

A    I assume so.

Q    Did you find out whether he did or not?

A    When we arrested him, he had two phones.  When we arrested him, he had three phones on him.

Q    And you hadn't been up on wiretaps on the other two phones.

A    No.

Q    Was one of the three phones that he has -- so you had been up on a wiretap on?

A    No.

Q    Did you have any intel about Mr. Guerra before November-December 2019?

A    Yes.

Q    I didn't hear any mention of guns.  Were there guns involved in this conspiracy?

A    No.

Q    Didn't hear any mention of violence.  Was there violence involved?

A    No.

Q    When was it that Mr. Guerra had expressed concern about when you guys were going to knock down his door?

A    It was prior -- it was after the seizure of the

January 8th.

Q    So the middle of January of 2019?

A    Yes.

Q    All right.  And did you surveil him after that?

A    No.

Q    Did he flee?

A    No, he didn't flee.

Q    To your knowledge, did he violate any state or federal law after that time?

A    Yes.

Q    Can you talk to me about that?

A    It's kind of involving an another investigation, Your Honor.  I'm happy to talk to him about it, but he's activity in another -- he actively was involved in another investigation where he was actually providing vehicles for trap vehicles and that was ongoing.

Q    So after January of 2019?

A    Yes.

Q    Okay.  Does that involve the same participants as this Indictment?

A    No.

Q    Whose investigation is that?

A    It's another DEA investigation.

Q    Are you the case agent on that?

A    I'm not the case agent, no.

Q    Tell us about the prior intel that you had regarding Mr. Guerra?

A    The prior intel we have is that Mr. Guerra was utilizing Honda Ridgelines and he was providing those Honda Ridgelines to an individual to build traps in prior to our investigation.

Q    And is that the same conduct that you're talking about after January 8th?

A    Yes.

Q    Honda Ridgelines with traps in them.

A    Yes.

Q    I wasn't entirely clear on how you connected Mr. Guerra with the BBMs.  So you received BBMs from Calexico.

A    Yes, sir.

Q    And the BBMs are attached to a phone number?

A    Yes.

Q    The first data you're getting through the phone.

A    You want me to elaborate?

Q    Yes, please.

A    Okay.  So PPR is called "Protective Precise Resource." It's a third party.  They actually comes back with BlackBerry.  They control -- they actually own the app.

Q    Can you get the app for non-BlackBerry phones?

A    The app is for non-BlackBerry phone.

Q    Okay.  What does it do?

A     So the app is for a non-BlackBerry phones.  You download the BlackBerry Messenger onto your phone and when you do that, you have to put your phone number into that app.

Q     So you put in the phone number of the phone on which you're calling (indiscernible)?

A     You install the software into that app.

Q     And at that point, PPR has the data.

A     Right, at that point, PPR has the data.  And that generates a BlackBerry Messenger which starts with E.  It generates a BlackBerry app, BlackBerry Messenger where you can actually PIN Somebody PIN to PIN back and forth.

Q     Okay.  That code is unique to the app.

A     To that device.

Q     Which is unique to that device.

A     Yes.  But you've got to put your number in there.

Q     And so you got the E number, you subpoenaed the phone number from PPR and at that point you had a phone number.

How did you connect that phone number?

A     No.  We submit it.  So we got the BlackBerry.  Because remember, he's been intercepted with Lic MX over BlackBerry Messenger, over the PIN to PIN.  So we take that PIN number and we send that PIN number to PPR and say, "Hey, send us the phone number that's connected to this PIN."

Q     Oh, I thought that's what I was saying.

A    Yeah.

Q    So then you had a phone number.

And how did you connect that phone number with Mr. Guerra?

A    Well, then we -- once we flip that phone number -- once we flip the PIN and get the phone number, we went up on a ping and T-Mobile -- we got authorized a ping for that phone and we started pinging it and we started surveilling it where we surveilled Mr. Guerra.

Q    Okay.  You find the location of the phone, you start surveilling those areas --

A    Yes.

Q    -- with that phone.

A    Yes.

MR. BENNETT:  I'll pass the witness.

MR. GALLAGHER:  Just a couple of follow ups.

REDIRECT EXAMINATION OF MARTEZ BENAS

BY MR. GALLAGHER:

Q    How frequently does he travel to Mexico?

THE COURT:  I'm sorry, (indiscernible) you.

MR. GALLAGHER:  I'm sorry.

BY MR. GALLAGHER:

Q    How frequently does he travel to Mexico?

A    He travels to Mexico very often.  In 2018, he went -- during our conspiracy -- and actually we have -- and it was

a wiretap.  We had wiretaps that coincide with the time that he went to Mexico -- not all of them but some of them where he went to Mexico on -- five times in '18 -- just during that month.  Not total, but during that month.  And then we have -- after that, we have another three crossings after that.  That's when we got him on the 20th when he came back. And the reason why we arrested him first is because we were afraid of him fleeing to Mexico because he had so much ties to Mexico.  He had a -- he has a house and he was born in that area.

Q    He owns property in Mexico?

A    Yes, he owns property in Mexico.

Q    How do you know that?

A    Because we talked to the family, the family said that they had a house in Mexico in the Monterrey area.

Q    And in fact he was born in Monterrey.

A    He was born in the Monterrey area, like Nueva Leon something like that, I think.

Q    Is he a US citizen?

     (Recording ends abruptly at 3:57 p.m.)

     (Proceedings adjourned at 4:03 p.m.)

*  *  *  *  *

*I certify that the foregoing is a correct transcript to the best of my ability produced from the electronic sound recording of the proceedings in the above-entitled matter.*

*/S/ MARY D. HENRY*

*CERTIFIED BY THE AMERICAN ASSOCIATION OF*

*ELECTRONIC REPORTERS AND TRANSCRIBERS, CET\*\*337*

*JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

*JTT TRANSCRIPT #61092*

*DATE FILED:  NOVEMBER 21, 2019*